STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. VICTOR GIAMPIETRO, LOUIS MALANGA, JOSEPH RADO AND FRANK McBRIEN, PLAINTIFFS IN ERROR.

Argued March 20, 1930—Decided May 19, 1930.

For the plaintiffs in error, *Irving Siegler, C. Stuart Patterson, J. Victor D'Aloia* and *John A. McLaughlin.*

For the defendant in error, *Joseph L. Smith* and *Simon L. Fisch.*

The opinion of the court was delivered by

LLOYD, J. Appellants were convicted of murder in the first degree without recommendation to life imprisonment. Appealing they have filed twenty-two assignments of error and in substantially identical language the same number of reasons for reversal with an added one that the verdict was contrary to law and against the weight of the evidence.

The murder in this case, as the evidence fairly showed, was committed in the carrying out of a preconcerted plan to rob the Public Service Co-ordinated Transport Company by holding up George B. Lee, its cashier, at its bus station in Newark. The fact was established by overwhelming proof that the defendants with another man named Orlando, who was later killed in an encounter with the police in Chicago, met at 725 High street, Newark, in an apartment maintained by one Margaret Rosenthal, a place frequented by them and at which they had previously met and divided the fruits of other robberies. There on September 24th, 1928, the plans were laid to commit the robbery. Giampietro had once been employed by the Public Service Company as a bus driver and knew the layout of the premises in which the robbery was planned to be carried out, the offices, entrances and exits. He still retained his Public Service uniform and it was arranged that this uniform should be used as a means of easy access to the place. In the early morning of October 15th following, the defendants, with Orlando, proceeded to put their plans into execution. Arriving at the bus station they found Lee on duty behind the cashier's window. Four of the five entered the office. Lee, having retreated behind a partition of an adjoining room, was ordered to come out and on compliance with this direction, he was shot and killed by McBrien. Defendants then put the money into pillow cases which they had

brought with them, and McBrien called the telephone operator and reported that there had been a shooting at the place. Defendants then left in an automobile, and later Lee was found dead in the premises.

The various assignments of error and reasons for reversal are argued under eight points.

The first of these is that the judge erred in granting the state's motion for setting aside an order of severance which had been previously made granting to McBrien a separate trial. This, like the original motion for a severance, was a matter wholly within the discretion of the court. The theory that it makes an adjudication under which the legal status of the parties becomes *res adjudicata* is without substance. Though all of the defendants were named in the same indictment, but three of them had been arrested, and when the case was first called for trial on November 18th, 1929, McBrien not having been apprehended, a severance was ordered as to him. There was a mistrial, and later, McBrien being arrested, the order of severance previously granted was set aside. A severance is for the purpose of the trial only and the conditions existing at one time when a case is called for trial may be widely different from those existing at a later time. So it was here. There was no abuse of discretion in this, and in any event it is not shown that the defendants or any of them were prejudiced by the order in maintaining a defense upon the merits. The second point is that the court erred in denying a request reading as follows:

"Under this indictment for murder, a defendant may be convicted of murder in the first degree, murder in the second degree, or manslaughter as the evidence may show."

This request the court rightly refused. The proofs were all to the effect that the killing was in an attempt to commit a robbery. There was no other alternative, and, that being true, the section of the Crimes act which makes a killing under such circumstances murder in the first degree, eliminated both second degree and manslaughter.

It is next urged that the court erred in denying a request reading as follows:

"If you are satisfied that the defendant [McBrien, &c.] is guilty of murder in the first degree, beyond a reasonable doubt, you may by your verdict and as a part thereof, upon and after consideration of all the evidence, recommend imprisonment at hard labor for life, in which case this and no greater punishment shall be imposed."

And in coupling with a proper instruction covering the same point the words "with due regard to your duty to the community and the obligation of their oaths." It is complained that the duty to the community and the obligation of the oath should not have been added.

While chapter 134 of the laws of 1919 declares that a consideration of all the evidence shall be the basis of a recommendation to life imprisonment and trial judges should be on guard against the introduction of other elements that might influence the making or withholding such recommendation, we cannot say that the bounds fixed by the act were transgressed or that injury was done to the appellants here. Certainly no just complaint could be made that the jury were instructed to use their discretion with due regard to the obligation of their oath and it would seem that "the duty to the community" adds nothing to or takes nothing therefrom. The duty to the community, no matter how much appellants might distort its meaning, could in a legal sense imply nothing more than a duty to perform their duty as jurors in accordance with their oaths. A community can ask no more.

It is next complained that the court erred in its instruction that:

"The Crimes act makes murder which shall be committed in perpetration or attempting to perpetrate any robbery, murder in the first degree; and this provision is repeated. *Comp. Stat., p.* 1780, § 107. These provisions of our criminal law are so inexorable that, if two persons agree to rob another, as in this case, and one strikes a blow that results in the death of the victim, both are guilty. Citing *Roesel* v. *State,* 62 *N. J. L.* 216, 222; 41 *Atl. Rep.* 408. These statutory exactments are but declaratory of the common law. See 4 *Blacks. Com.* 200."

The complaint against this instruction is that it was misleading and confusing to the jury. We think it was neither. While the citation of authorities to a jury might not be greatly helpful, it could certainly not be harmful. It is particularly complained, however, that the words "as in this case" conveyed to the jury the idea that the present case was meant. Conceding that such an impression might be gained, it did no injury to the defendants. The suggestion of the instruction was predicated on the finding that there was an agreement to rob and a blow resulting in death struck in consequence, as evidenced by the entire charge.

The complaint that an instruction that "the jury was not bound to believe the written statements of two of the defendants in their entirety or disbelieve them in their entirety, though they might do so and that it had a right to consider them in the light of all of the evidence and believe some parts and disbelieve others" was erroneous is without merit. It would be a novel proposition that jurors were obliged to accept as verity and in their entirety the statements of persons charged with crime. The law to the contrary is stated by 1 *Greenl. Evid.*, § 201, when he says: "It is for the jury to consider, under' all the circumstances, how much of the whole statement [as here] they deem worthy of belief including as well the facts asserted by the party in his own favor as those working against him." See, also, cases cited in 16 *C. J.* 635, § 1263. In practice we have the same rule constantly illustrated and applied.

It is next urged that the court invaded the province of the jury when it stated in the charge that:

"The state had produced evidence which in the opinion of the court, whose opinion does not bind you, and which you as the sole judges of the facts are entitled to disregard, leads to the conclusion that all of these defendants did combine for the purpose of committing in concert a robbery; that they did in concert commit that robbery and that the death of George B. Lee ensued during and from the commission thereof, all being present and participating."

The right of a court of this state to comment on evidence and even to state its view thereof, so long as the jury's right to decide all questions of fact is preserved, is too well established in this state to be successfully controverted. *State* v. *Randall*, 95 *N. J. L.* 452.

On behalf of the appellant Rado it is contended that a conversation which took place at the time of Rado's arrest between David Reid, Jr., a member of the state police, and Clarence Miller and William Berger, proprietors of a roadhouse in which the arrest took place, was incompetent and should have been rejected. Reid found Rado in a roadhouse at Iona, New Jersey, and partially recognized him from photographs on police flyers. To verify his identification he spoke to Miller and Berger, asking them who Rado was and was told he was only a guest at the hotel, Miller adding, "Why do you want to know?" Reid replied, "Why don't you come clean and tell me?" Miller replied, "Give me a break, we are not doing any business, I will fix you up on five yards" (meaning $500), whereupon Berger joined in the conversation. Reid then accosted Rado saying, "Hello, Joe." Rado made no answer, when Reid added, "You are Rado, you know so and so from Newark." Rado replied, "You got me all wrong, my name is George Corbally," whereupon the officer showed him his badge and told him if he moved he would blow his head off, at the same time walking to the telephone booth and calling for help from his fellow troopers. In response Sergeant Bishop and Trooper Schreiack arrived and the proprietors tried to bribe Bishop to let Rado go. There was evidence that all of this was in the presence of Rado. It is contended that the purpose of the offers was to protect the good name of the place. The proofs admit of a different purpose, namely, that it was in the interest of Rado. In this situation it was clearly relevant and competent. The court properly limited the evidence to the case of Rado and neither he nor the other defendants were illegally aggrieved by its admission.

No argument or reason is urged in support of the contention that the verdict was contrary to law and against the

weight of the evidence, nor do we see how either could well be offered. The finding of the jury of murder in the first degree was fully justified by the proofs. Whether as to any of the defendants a recommendation to life imprisonment should be made was wholly within the province of the jury, and it is not surprising that this clemency was not extended in view of the evidence.

Finding no prejudicial error, the judgment of the court below is affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, TRENCHARD, PARKER, BLACK, CAMPBELL, LLOYD, CASE, BODINE, VAN BUSKIRK, KAYS, HETFIELD, DEAR, WELLS, JJ. 14.

*For reversal*—None.